| | | |
|---|---|---|
| SMARTLING, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 14-cv-13106-ADB |
| SKAWA INNOVATION LTD., | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

## MEMORANDUM AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

Plaintiff Smartling, Inc. ("Smartling") and Defendant Skawa Innovation Ltd. ("Skawa") are both translation technology companies that provide language translation services for mobile and internet-based clients.[1] On November 4, 2015, Smartling filed its First Amended Complaint asserting six causes of action against Skawa for alleged acts of trademark and trade dress infringement, unfair competition, and violations of Massachusetts General Laws Chapter 93A, §§ 2 and 11. [ECF No. 25] (the "Amended Complaint" or "Am. Compl."). Skawa responded

---

[1] Defendant Easyling LLC was also named as a party in both the initial and the operative complaint. [ECF Nos. 1, 25]. On November 17, 2015, the Court denied the motion to dismiss Easyling LLC as a party "without prejudice to renewal once discovery reveals whether Easyling, LLC is an appropriate party to this action." [ECF No. 30]. Although Defendants do not expressly move for summary judgment on this issue, Smartling now acknowledges that "[a]pparently [Easyling LLC] is not in fact an LLC . . . nor even a distinct entity from Skawa." [ECF No. 89 at 5 n.2]. Without further explanation, Smartling asserts that "[f]or the time being it seems prudent to continue naming both Skawa and Easyling as defendants." Id. The Court already deferred the adjudication of this issue pending discovery on Easyling LLC's corporate form. Discovery is now complete and Smartling acknowledges that Easyling LLC is not a legal entity. Smartling's request to further delay a ruling on this matter, based solely on its conclusory statement that it would "seem[] prudent" to do so, is insufficient. Easyling LLC is therefore dismissed from this action.

with a one-count counterclaim that accused Smartling of filing this lawsuit in bad faith and committing their own violations of Chapter 93A. [ECF No. 33] (the "Counterclaim"). Currently pending before the Court are Skawa's motion for summary judgment or judgment on the pleadings on all claims asserted in the Amended Complaint [ECF No. 77], and Smartling's motion for summary judgment on the Counterclaim. [ECF No. 74]. For the reasons stated herein, Skawa's motion is <u>granted</u> in part and <u>denied</u> in part, and Smartling's motion is <u>granted</u>.

## I.    BACKGROUND

Except as otherwise noted, the following facts are not in dispute. Smartling is a Delaware corporation with its principal place of business in New York. Am. Compl. ¶ 1. It was founded in 2009 as a provider of website internalization and localization services. [ECF No. 79 at ¶ 1] ("Skawa Facts"); [ECF No. 90 at ¶ 1] ("Smartling Response"). Generally speaking, Smartling's software platform connects users to computers or professionals that translate mobile applications, web pages, videogames, and other media into different languages. [ECF No. 25-1 at 2].

Skawa is a Hungarian company with its principal place of business in Budapest, Hungary. Am. Compl. ¶ 2. Since late 2011 when it launched its website, Skawa has marketed a web-based translation tool under the name "Easyling" that directly competes with Smartling. [ECF No. 76 at ¶¶ 2, 6] ("Smartling Facts"); [ECF No. 87 at ¶¶ 2, 3, 6] ("Skawa Response"). Both parties worked directly with website owners to market and advertise their products through websites, magazine advertisements, conference program pages, and conference exhibits. Smartling Facts ¶¶ 7−8; Skawa Response ¶¶ 7−8. They both contracted with translation agencies or language service providers, including Lionbridge Technologies, Inc. ("Lionbridge"). Smartling Facts ¶ 10; Skawa Response ¶ 10. Lionbridge originally contracted with Smartling for its services but also entered into a contract to resell Smartling's product and services to other

customers. Skawa Facts ¶ 36. At some point, Lionbridge, and several of Lionbridge's clients who had been using Smartling software, ended their relationship with Smartling. Id. Smartling's CEO, Jack Welde, believed that Lionbridge had begun contracting with Skawa as a new partner to replace Smartling. Id. Lionbridge, however, is not a party to this litigation, and there are no allegations in the Amended Complaint or in the summary judgment record that Lionbridge acted at the direction of Skawa or otherwise committed any wrongful conduct.

On March 18, 2011, Skawa's CEO, Peter Farago, created an online account with Smartling's website. Smartling Facts ¶ 4. The next day, on March 19, 2011, Skawa registered the web domain name "easyling.com," and launched the Easyling website in September or November 2011. Smartling Facts ¶¶ 2, 6; Skawa Response ¶¶ 2, 3, 6; see also Skawa Facts ¶ 11; Smartling Response ¶¶ 9, 11. Skawa appears to have registered the Easyling mark with the United States Patent and Trademark Office sometime in 2014. [ECF No. 78 at 36].

Exhibits showing the Smartling and Easyling marks on the parties' respective websites have been submitted into the record. Smartling has produced nine representative samples showing the different versions of its website between January 2010 and late 2015. [ECF No. 78-4 at 4−5]; [ECF No. 78-5]. The February 2011 version of its website, see [ECF No. 25-1 at 6]; [ECF No. 78-5 at 5], was active for approximately eight months until it launched a new iteration of its website in October 2011. Easyling Facts ¶ 9; Smartling Response ¶ 9.[2] Smartling asserts that Skawa copied its February 2011 website when it created the original Easyling website, which launched in September or November 2011 and remained in use until at least mid-2012.

---

[2] The October 2011 version of Smartling's website appears to be depicted in ECF No. 78-5 at 6. See [ECF No. 78-4 at 5] (describing [ECF No. 78-5 at 6] as dated in "Late 2011").

Smartling Facts ¶ 3; Skawa Facts ¶ 11; Smartling Response ¶¶ 9, 11.[3] As discussed further below, Smartling claims that the Easyling website mimicked the orange and blue color scheme used for Smartling's website, displayed the Easyling mark in the same color and similar font as Smartling's mark, and used a speech bubble as part of the Easyling logo which was also part of Smartling's logo. Smartling Facts ¶ 11–12. Moreover, Smartling asserts that Skawa displayed buttons on the Easyling website in a layout similar to that used by Smartling, copied aspects of Smartling's promotional video which was displayed on its website, and copied verbatim the terms and conditions language from Smartling's website. Id.

## II.    LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted). Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. (citation omitted). By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case." United States v. One Parcel of Real Prop.

---

[3] A screenshot of the Easyling website in November 2011 is shown in ECF No. 25-1 at 11, and a screenshot of the Easyling website in January 2012 is shown in ECF No. 25-1 at 12. Skawa refers to a May 1, 2013 version of their website as being depicted in Exhibit J to their summary judgment motion, but Exhibit J does not show any copy of Easyling's website. Easyling Facts ¶ 21; [ECF No. 78-10]. Screenshots attached to the original complaint [ECF No. 1-2] show the Easyling website in 2014. [ECF No. 1-2 at 5−6].

(Great Harbor Neck, New Shoreham, R.I.), 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). "To succeed in showing that there is no genuine dispute of material fact," the moving party must "'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).

Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, N.H., 303 F.3d 91, 94 (1st Cir. 2002) (internal quotations and citation omitted). That is, the nonmoving party must set forth specific, material facts showing that there is a genuine disagreement as to some material fact. One Parcel of Real Prop., 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256–57 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6 (citation omitted). The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 396–97 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported

speculation." <u>Cochran</u>, 328 F.3d at 6 (quoting <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990)).[4]

## III.    SKAWA'S MOTION FOR SUMMARY JUDGMENT

Skawa moves for summary judgment on all counts asserted in the Amended Complaint including: "Federal Unfair Competition, False Designation of Origin and Passing Off" (Count I); "Trade Dress Infringement" (Count II); "Infringement of the Smartling Mark" (Count III); "Cancellation of the Easyling Mark" (Count IV); "Violation of [Chapter 93A]" (Count V); and "Common Law Unfair Competition" (Count VI).

### A.    Trademark Infringement, Cancellation, and Unfair Competition

Counts I and III of the Amended Complaint are based on the following language in the Lanham Act:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

---

[4] Skawa improperly frames its dispositive motion both as a summary judgment motion and as a motion for judgment on the pleadings. It offers no explanation for waiting nearly two years after answering the Amended Complaint to move for judgment on the pleadings. Skawa does not identify any claims that are appropriate for dismissal under Rule 12(c) as opposed to Rule 56, or otherwise distinguish its arguments between those two standards. It is inappropriate for Skawa to seemingly tack the Rule 12(c) standard onto a summary judgment motion to introduce favorable evidentiary materials into the record while asking the Court to look only to the pleadings for the Rule 12 motion. Rule 12(c) makes clear that "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." <u>See</u> <u>Gulf Coast Bank & Tr. Co. v. Reder</u>, 355 F.3d 35, 38 (1st Cir. 2004) (because court did not exclude the outside materials submitted with the Rule 12(c) motion, "the summary judgment standard govern[ed] the disposition of the motion"). Here, because Skawa has submitted numerous exhibits into the record, which the Court does not exclude given that both parties are moving for summary judgment, Skawa's motion shall be considered only under the Rule 56 standard of review.

15 U.S.C. § 1125(a)(1)(A).[5] This section of the Lanham Act, "prong (A)," prohibits "[f]alse designations of origin." Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 208 (1st Cir. 1996). "Typical claims under prong (A) would involve a new trademark that was confusingly similar to an already established one, or an attempt by a defendant to 'palm-off' its goods as those of a competitor by use of the competitor's mark." Id. (citing 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27.02 [4] (3d ed. 1996) (describing these claims as "trademark infringement")).

Here, where Counts I and III arise solely under prong (A), each count has "likelihood of confusion" as an essential element. "To succeed on a claim of trademark infringement, a plaintiff must establish . . . that the allegedly infringing use is likely to cause consumer confusion."[6] Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008). "The same likelihood of confusion standard applies to the unfair competition and false designation of origin

---

[5] Smartling's common law unfair competition claim (Count VI) is premised on the same theory as its federal unfair competition and trademark infringement claims, Am. Compl. ¶¶ 68–69. See Black Dog Tavern Co. v. Hall, 823 F. Supp. 48, 58 (D. Mass. 1993) (Massachusetts common law claims of unfair competition in trademark context "must be supported by a showing of a likelihood of confusion"); Datacomm Interface, Inc. v. Computerworld, Inc., 489 N.E.2d 185, 191 (Mass. 1986) ("[T]he gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services."); Straumann Co. v. Lifecore Biomedical Inc., 278 F. Supp. 2d 130, 140 (D. Mass. 2003) (dismissing "state law trademark and unfair competition claims [that were] indistinguishable from the Lanham Act claim"); see also Boston Granite Exch., Inc. v. Greater Boston Granite, LLC, No. 11-cv-11898-JLT, 2012 WL 3776449, at *5 (D. Mass. Aug. 29, 2012) (standard for trademark infringement under Massachusetts common law "is essentially the same as that under the Lanham Act"); Leejay v. Bed Bath & Beyond, Inc., 942 F. Supp. 699, 701 n.2 (D. Mass. 1996) ("Because trademark infringement is defined in essentially the same terms under the Lanham Act and under [Massachusetts statutory and common law], . . . state claims will not be different enough to merit separate discussion.").
[6] To succeed on a claim of trademark infringement, a plaintiff must also establish "that its mark is entitled to trademark protection." Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008). For the purposes of summary judgment, however, Skawa does not dispute that Smartling's mark is protectable.

claims." <u>Santander Consumer USA Inc. v. Walsh</u>, 762 F. Supp. 2d 217, 225 (D. Mass. 2010); <u>see</u>

<u>Venture Tape Corp. v. McGills Glass Warehouse</u>, 540 F.3d 56, 61 n. 6 (1st Cir. 2008)

("Venture's unfair competition claim (Count 2) and false designation claim (Count 3) are subject

to the same legal standard—namely, 'likelihood of confusion'—as its Count 1 infringement

claim").[7]

The First Circuit has interpreted "likely to cause consumer confusion" to mean "more

than the theoretical possibility of confusion." <u>Boston Duck Tours, LP</u>, 531 F.3d at 12 (quoting

<u>Winship Green Nursing Ctr.</u>, 103 F.3d at 200); <u>see</u> <u>Peoples Fed. Sav. Bank v. People's United</u>

<u>Bank</u>, 672 F.3d 1, 9–10 (1st Cir. 2012) (same). "In other words, allegedly infringing conduct

must create 'a likelihood of confounding an appreciable number of reasonably prudent

purchasers exercising ordinary care.'" <u>Boston Duck Tours, LP</u>, 531 F.3d at 12 (quoting <u>Winship</u>

<u>Green Nursing Ctr.</u>, 103 F.3d at 201). The reasonably prudent purchaser is not limited to the

actual or potential buyer of the product, but also includes "persons in a position to influence the

purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill,

or reputation of the trademark owner." <u>Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.</u>, 376 F.3d 8,

10, 16 (1st Cir. 2004) ("[L]ikelihood of confusion inquiry . . . includes others whose confusion

threatens the trademark owner's commercial interest in its mark."). Courts in this circuit consider

---

[7] In Count IV, Smartling asks this Court to cancel the Easyling mark's registration pursuant to 15
U.S.C. § 1119, because "the Smartling mark is senior to the Easyling mark and the Defendants'
use of the Easyling mark creates significant consumer confusion." Am. Compl. ¶ 61. "[D]istrict
courts can cancel registrations during infringement litigation, just as they can adjudicate
infringement in suits seeking judicial review of registration decisions. <u>B & B Hardware, Inc. v.</u>
<u>Hargis Indus., Inc.</u>, 135 S. Ct. 1293, 1307 (2015). The "likelihood of confusion for purposes of
registration is the same standard as likelihood of confusion for purposes of infringement." <u>Id.</u>
Given that Skawa primarily moves for summary judgment on the grounds that Smartling cannot
establish likelihood of confusion, the Court shall apply the standard uniformly to Counts I, III,
IV, and VI.

the following non-exhaustive list of factors, known as the "Pignons" factors, when assessing the likelihood of confusion:

> (1) the similarity of the marks; (2) the similarity of the goods (or, in a service mark case, the services); (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark.

The Shell Co. (Puerto Rico) Ltd. v. Los Frailes Service Station, Inc., 605 F.3d 10, 22 & n.9 (1st Cir. 2010) (quoting Int'l Ass'n of Machinists, 103 F.3d at 201); see Pignons S. A. de Mecanique v. Polaroid Corp., 657 F.2d 482 (1st Cir. 1981) (same). The inquiry is "highly fact-intensive." The Shell Co., 605 F.3d at 22.

1.     Similarity of the Marks

"The degree of similarity between the marks is the 'single most important factor in determining likelihood of confusion.'" Solmetex, LLC v. Dentalez, Inc., 150 F. Supp. 3d 100, 111–12 (D. Mass. 2015) (quoting McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 367 (3d Cir. 2007)). "[T]he similarity of the marks takes prominence when, as is the situation here, the goods are direct competitors in the marketplace." Id. (citing Boston Duck Tours, LP, 531 F.3d at 30). "[W]hen the goods or services are virtually identical, the marks need not be as similar for there to be a likelihood of confusion." Veve v. Corporan, 977 F. Supp. 2d 93, 101 (D.P.R. 2013) (citing Bridgestone Am. Tire Operations, LLC v. Fed. Corp., 673 F.3d 1330, 1337 (Fed. Cir. 2012) (likelihood of confusion between "Potenza" and "Turanza" marks was greater because both referred to tires)).

"[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." Boston Duck Tours, LP, 531 F.3d at 29 (quoting Pignons, 657 F.2d at 487); see Copy Cop, Inc. v. Task Printing, Inc., 908 F. Supp. 37, 44 (D. Mass. 1995)

("[T]he relevant standard is the 'total effect' of the mark, considering sight, sound, and meaning." (citing <u>Volkswagenwerk Aktiengesellschaft v. Wheeler</u>, 814 F.2d 812, 817 (1st Cir. 1987))). "Marks should not be simply compared side-by-side, but 'in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods . . . .'" <u>Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc.</u>, 288 F. Supp. 2d 105, 114–15 (D.N.H. 2003), <u>aff'd,</u> 105 Fed. App'x 285 (1st Cir. 2004) (quoting <u>Copy Cop</u>, 908 F. Supp. 37, 44 (D. Mass. 1995)).

Here, although the marks contain different words ("smart" vs. "easy") and a different number of syllables, both marks are one-word, invented terms composed of an adjective preceding the "ling" at the end of the mark. The manner in which these marks are displayed on each company's respective website also share similarities. Using Smartling's February 2011 website as the relevant point of reference, both marks are shown at the top left-hand corner of the webpage. Both marks are written in white, sans-serif font and in all lower-case lettering. The word Easyling is displayed inside of a blue speech bubble; Smartling's website displays a speech bubble that reads "Hi" next to the word mark. Moreover, although not identical, both websites use a similar orange and blue color scheme against which the marks are shown. <u>Compare</u> [ECF No. 78-5 at 5], <u>with</u> [ECF No. 25-1 at 11]; <u>see</u> <u>Veve v. Corporan</u>, 977 F. Supp. 2d 93, 100−01 (D.P.R. 2013) ("Batey" and "Atabey" marks were similar where both companies' websites had "similar dark-colored backgrounds and are covered with pictures of groups of tourists on various stages of hikes through forested areas and caves" so that "[t]he websites, when taken as a whole, create the same general overall impression."). Although the marks are not identical, considering the manner in which they are displayed, and the fact that Smartling and Skawa market the same

services in direct competition with one another, this factor weighs in favor of Smartling at this stage.

### 2. Similarity of the Goods

Skawa does not dispute that both parties sell the same type of product—a translation proxy software application. Accordingly, this factor favors Smartling. See Solmetex, LLC v. Dentalez, Inc., 150 F. Supp. 3d 100, 113 (D. Mass. 2015) ("The parties do not dispute that [their respective products] are substantially similar pieces of equipment. Both are amalgam separators used to filter dental wastewater streams . . . . This factor weighs in favor of Plaintiff."); Dorpan, S.L. v. Hotel Melia, Inc., 728 F.3d 55, 66 (1st Cir. 2013) (finding similarity of goods where "there is substantial overlap in the core services offered by each hotel").

### 3−5. Relationship between the Parties Advertising, Channels of Trade, and Classes of Prospective Purchasers

"Factors three (channels of trade), four (advertising), and five (classes of prospective purchasers) are often considered together because they tend to be interrelated." Beacon Mut. Ins. Co., 376 F.3d at 19; see Peoples Fed. Sav. Bank, 672 F.3d at 14 (describing these factors as "interrelated"). Skawa does not dispute that the parties use the same trade channels and forms of advertising. They both market their products online through their websites, have advertised in the same publications, and attend the same trade shows. Smartling Facts ¶ 7; see Dorpan, 728 F.3d at 66–67 (finding that parties advertised and solicited customers in substantially similar manners where parties were both hotels that "attend trade shows, develop relationships with travel agents, advertise directly to consumers, and accept reservations through Internet booking sites").

Skawa also does not dispute that the parties compete for the same customer base but argues that the likelihood of confusion is minimal given that the prospective purchasers of online translation services are sophisticated, professional buyers. See Pub. Impact, LLC v. Bos.

Consulting Grp., Inc., 169 F. Supp. 3d 278, 294 (D. Mass. 2016) ("The likelihood of confusion may be substantially reduced when the relevant buyer class is composed of sophisticated professional or commercial purchasers of goods and services."); Astra Pharm. Prod., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1206 (1st Cir. 1983) ("And there is always less likelihood of confusion where goods are expensive and purchased after careful consideration."). Skawa's evidence that the "reasonable prudent purchaser is the professional buyer of translation services for websites and other content," however, is apparently contained in an affidavit that does not appear to be in the summary judgment record. See [ECF No. 78 at 30].[8] Thus, when the parties use the same channels of trade and forms of advertising, directed toward the same class of purchasers, and given that Skawa has failed to provide sufficient evidence regarding the level of sophistication of internet translation purchasers as a class, the Court finds that, at this stage, this set of factors favors Smartling.

6.    Actual Confusion

Smartling has not attempted to present any evidence of actual confusion. "[E]vidence of actual confusion is oftentimes 'considered the most persuasive evidence of likelihood of confusion because past confusion is frequently a strong indicator of future confusion.'" Santander Consumer USA Inc., 762 F. Supp. 2d at 227 (quoting Beacon Mut. Ins. Co., 376 F.3d at 18). Nonetheless, "[a]ctual confusion is not a prerequisite to a finding of likelihood of confusion." Visible Systems Corp. v. Unisys Corp., 551 F.3d 65, 74 (1st Cir. 2008). "[A] trademark holder's burden is to show likelihood of confusion, not actual confusion." Borinquen

---

[8] Skawa cites to "Ex. R: Faragó Aff. ¶ 4" but Exhibit R to Easyling's motion is an unrelated email chain. In other instances, the "Faragó Aff." is identified as Exhibit S, which also does not include an affidavit. [ECF No. 78 at 25]. The Court has been unable to locate any such affidavit executed by Mr. Faragó in the record.

Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 120 (1st Cir. 2006) (citations omitted).

"Historically, [the First Circuit has] attached substantial weight to a trademark holder's failure to prove actual confusion only in instances in which the relevant products have coexisted on the market for a long period of time." Id. at 121. "[A]bsent evidence of actual confusion, when the marks have been in the same market, side by side, for a substantial period of time, there is a strong presumption that there is little likelihood of confusion." Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Crédito Oriental, 832 F.3d 15, 30–31 (1st Cir. 2016) (quoting Pignons, 657 F.2d at 490). "Applying this principle, the First Circuit has found that little or no evidence of actual confusion over periods of three and one-half years, Keebler Co. v. Rovira Biscuit Corp., 624 F.2d 366, 377 (1st Cir. 1980), four years, Pignons, 657 F.2d at 490–91, and six years, [Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 4 (1st Cir. 1993)], strongly indicate against a likelihood of confusion." Butcher Co. v. Bouthot, 124 F. Supp. 2d 750, 758 (D. Me. 2001).

Here, Smartling and Easyling have existed together in the online translation services industry since 2011 without any alleged instances of actual confusion. Smartling does not address the absence of evidence of actual confusion but instead criticizes Skawa's arguments as "impermissibly myopic" with regard to the types of confusion that are actionable under the Lanham Act. [ECF No. 89 at 16]. Smartling notes that "the likelihood of confusion inquiry is not limited to actual or potential purchasers, but also includes others whose confusion threatens the trademark owner's commercial interest in its mark," and that "[t]he fact that the injury is to a company's reputation or goodwill, rather than directly to its sales, does not render the confusion

any less actionable." <u>Beacon Mut. Ins. Co.</u>, 376 F.3d at 15, 16.[9] Smartling, however, provides no legal support for the idea that a lack of actual confusion is not a relevant factor in the <u>Pignons</u> analysis even where the argument is that someone besides the actual or potential purchasers may be confused, or where confusion may cause harm to a trademark holder's reputation or goodwill.

Smartling references a "reverse" confusion theory and claims that "downstream" confusion is actionable, where the "initial purchaser of goods or services knows perfectly well that they are buying a knock-off, but then resells that knock-off to an end user who may not have the same, complete information." [ECF No. 89 at 17]. "[U]nder a reverse confusion theory, customers purchase the senior user's goods under the 'misimpression that the junior user is the source of the senior user's goods . . . . [C]onsumers may consider [the senior user] the unauthorized infringer, and [the junior user's] use of the mark may in that way injure [the senior user's] reputation and impair its goodwill.'" <u>Visible Sys. Corp. v. Unisys Corp.</u>, 551 F.3d 65, 72 (1st Cir. 2008) (quoting 4 <u>McCarthy on Trademarks</u> § 23:10, at 23–47). "Harm from the reverse confusion may occur because the junior user 'saturates the market' and overwhelms the senior user, causing harm to the value of the trademark and the senior user's business." <u>Id.</u> (quoting <u>Attrezzi, LLC v. Maytag Corp.</u>, 436 F.3d 32, 39 (1st Cir. 2006)). Still, "[t]here is no actionable reverse confusion in the absence of a showing of likely confusion as to source or sponsorship."

_____

[9] Smartling also argues that "pre-sale" or "initial interest" confusion is actionable, but "the First Circuit has yet to adopt this concept." <u>Concordia Partners, LLC v. Pick</u>, No. 2:14-CV-009-GZS, 2015 WL 4065243, at *9 n.7 (D. Me. July 2, 2015); <u>see</u> <u>Moving & Storage, Inc. v. Panayotov</u>, No. CIV.A. 12-12262-GAO, 2014 WL 949830, at *4 (D. Mass. Mar. 12, 2014) ("However, even if [the initial interest] doctrine were recognized in this Circuit, which it has not been, mere diversion, without any hint of confusion, is not enough" (punctuation and citation omitted)); <u>Hearts on Fire Co., LLC v. Blue Nile, Inc.</u>, 603 F. Supp. 2d 274, 283 (D. Mass. 2009) (noting that initial interest confusion has "not been fully explored or addressed by the First Circuit"). Even if it were a cognizable theory, Smartling has not submitted any evidence of "initial interest" confusion.

Id. at 72 (citing <u>DeCosta v. Viacom Int'l, Inc.</u>, 981 F.2d 602, 609 (1st Cir. 1992); <u>see</u> <u>Riverbank,</u> <u>Inc. v. River Bank</u>, 625 F. Supp. 2d 65, 70 (D. Mass. 2009) ("The Court further notes, however, that in either case, 'forward confusion' or 'reverse confusion,' the plaintiff must establish likelihood of confusion."). Despite marshalling the legal principles underlying several theories of potential confusion or harm, Smartling at no point attempts to support these theories with evidence in the record of actual confusion and fails to show that evidence of actual confusion is not relevant where reverse or downstream confusion is claimed. Thus, this factor weighs strongly in Skawa's favor given the number of years that Smartling and Skawa have existed together in the marketplace and the absence of any evidence of actual confusion.

       7.   <u>Intentional Copying</u>

Smartling emphasizes "that when an alleged infringer intentionally copies a trademark, it may be presumed that [the alleged infringer] intended to cause confusion and profit thereby." <u>Winship Green Nursing Ctr.</u>, 103 F.3d at 206. "This rebuttable presumption works with maximum efficiency in the commercial setting. There, an infringer typically copies a trademark to palm off [his or her] own goods as those of a recognized manufacturer, thereby free riding on the markholder's reputation and goodwill." <u>Id.</u> at 206 n.10; <u>see</u> <u>Boston Athletic Ass'n v.</u> <u>Sullivan</u>, 867 F.2d 22, 34 (1st Cir. 1989) (adopting presumption that in cases of intentional copying, "the second comer is generally 'presumed to have intended a confusing similarity of appearance'" (citation omitted)); <u>Three Blind Mice Designs Co. v. Cyrk, Inc.</u>, 892 F. Supp. 303, 312 (D. Mass. 1995) ("Intentional copying gives rise to a strong presumption that confusion was likely."). "However, '[m]ere knowledge of the existence of a competitor's mark is insufficient to prove bad faith.'" <u>Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.</u>, 828 F. Supp. 2d 384, 395 (D. Mass. 2010) (quoting <u>NEC Elecs., Inc. v. New Eng. Circuit Sales, Inc.</u>,

722 F. Supp. 861, 866 (D. Mass. 1989)). "Bad faith requires proof that one party intended to capitalize on the holder's reputation/goodwill and confusion between the marks." Id. As the district court explained in HQ Network Systems v. Executive Headquarters when evaluating the likelihood of confusion between "Headquarters Companies" and "Executive Headquarters":

> As to . . . the defendants' intent in adopting the mark: Here [defendant's officer] was aware of Headquarters Companies . . . . He knew the line of work they were in, and he knew that [his company] . . . was going to get into precisely that line of work. On the other hand, the word "headquarters" and the phrase "headquarters company," . . . are descriptive terms . . . . If these were arbitrary terms, whimsical terms, this Court would have little hesitancy on this record in concluding that [defendant's officer] adopted the title Executive Headquarters to copy Headquarters Companies.

755 F. Supp. 1110, 1119 (D. Mass. 1991). Similarly, here, Skawa was plainly aware of Smartling in March 2011 when Skawa's CEO created an account with Smartling's website, one day before Skawa registered the Easyling web domain. Viewed in the light most favorable to the non-moving party, the original Easyling website also shared at least a similar color scheme and layout, identical terms and conditions language, and a promotional video that used similar elements as a promotional video hosted on Smartling's website. In contrast to HQ Network Systems, Smartling's mark exists somewhere between "descriptive" and "suggestive" on the spectrum of trademark distinctiveness, as discussed further below. Thus, although the evidence of intentional copying is not particularly robust, this factor weighs at least slightly in favor of Smartling at this stage of the case.

8. Strength of the Mark

"Factors useful in determining a trademark's relative strength include the length of time a mark has been used and the plaintiff's relative renown in its field; the strength of the mark in plaintiff's field of business, especially by looking at the number of similar registered marks; and

16

the plaintiff's actions in promoting its mark." Black Dog Tavern Co. v. Hall, 823 F. Supp. 48, 58 (D. Mass. 1993) (quoting Tanel Corp. v. Reebok Int'l, Ltd., 774 F. Supp. 49, 55 (D. Mass. 1990)). Here, Smartling has used its mark in commerce since 2009 and submitted into the record several media publications demonstrating that is has achieved at least some renown in the translation industry. See [ECF No. 75-21 at 2] (one of fifty companies selected by the VentureWire editorial team as breaking conventional methods through novel technology or advanced services); [ECF No. 25-1 at 2] (Wall Street Journal article describing Smartling's $25 million venture funding and noting that "[h]undreds of translation agencies also use Smartling's software to manage projects and work with their clients"). Several other companies in the translation industry, however, also combine descriptive words with the ending "ling" to form a brand name, thereby weakening the Smartling mark. See Int'l Ethical Labs., Inc. v. Advance Generic Corp., No. 10-cv-1381-ADC, 2011 WL 13232287, at *5 (D.P.R. Mar. 31, 2011) (analyzing the similarity of Relagesic and Bioregesic and finding "the marks at issue may be considered similar in sound inasmuch as they both end in the word 'gesic'. But, again, . . . this similarity is mitigated by the fact that there are 22 marks currently registered with the U.S. Patent and Trademark Office for analgesics which end in—gesic.").

Skawa primarily contends that Smartling's mark is weak because it is merely descriptive, rather than suggestive or fanciful. "A mark is descriptive if it 'conveys an immediate idea of the ingredients, qualities or characteristics of the goods.'" Solmetex, LLC v. Dentalez, Inc., 150 F. Supp. 3d 100, 115 (D. Mass. 2015) (quoting Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 544 (1st Cir. 1995)). "On the sliding scale of distinctiveness, descriptive marks occupy the lowest level that warrants protection," and a "descriptive mark is entitled to trademark protection only if it has acquired secondary meaning—consumers associate the mark with a particular

product." Id. (citing Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008); Equine Techs., Inc., 68 F.3d at 544 n.2). In comparison, "[s]uggestive marks are one notch higher on the spectrum of distinctiveness," and are "inherently distinctive, with no requirement to prove secondary meaning." Id. (citing Equine Techs., Inc., 68 F.3d at 544 n.2). If a mark "requires imagination, thought and perception to reach a conclusion as to the nature of goods," it is suggestive. Id. (quoting Equine Techs, Inc., 68 F.3d at 544). "The line between descriptiveness and suggestiveness can be a blurry one and is not easily drawn. In making this determination, the court considers 'the mark in its entirety, with a view toward "what the purchasing public would think when confronted with the mark as a whole.""" Id. (quoting Equine Techs., Inc., 68 F.3d at 544).

For the purposes of summary judgment, Skawa has not argued that Smartling's mark is not protectable, and taken in the light most favorable to Smartling, its mark is suggestive or descriptive and has a secondary meaning. Although "Smartling" is an invented term, and therefore would arguably be classified as a suggestive mark, it is essentially a simple combination of the word "smart" and the abbreviation for linguistics, "ling," which slides the mark toward descriptiveness.[10] Linguistics is a broad concept that encompasses more than the professional language translation services for online companies provided by Smartling. See Attrezzi, LLC, 436 F.3d at 38 (noting that with regard to a business named Attrezzi LLC that sold chef's tools, the word "Attrezzi translates as 'tools,' not 'chef's tools'," and therefore "the

_____

[10] Smartling's CEO, Jack Welde, explained that when he created his company in 2009, he intended the name "Smartling" to be a "fanciful" word. [ECF No. 78-2 at 5]. According to Mr. Welde, "Smartling" has an element connoting "smart, clever, curious, [or] interesting," as well as an element referencing "language or linguistics." Smartling Response ¶ 5. When Smartling created its mark, other companies existing in the translation industry were also using "ling" as part of their name: MultiLing, PowerLing, LingPerfect, Lingo24, Inlingua, WorldLingo, Lingvo, and LingQ. Skawa Facts ¶¶ 1–3; [ECF No. 78-2 at 6].

term can easily be viewed as suggesting a similarity, not an identity, between ordinary workman's tools and electrical appliances or the like used by a chef," allowing the jury to find the term suggestive). Thus, although the Smartling mark is not entirely arbitrary, a reasonable fact finder could conclude that imagination is required to connect "Smartling" with its product in the language translation field, making the mark suggestive and thereby stronger. This factor therefore supports Smartling.

In sum, the Pignons analysis presents a close call: the marks are similar, the products compete directly, the companies use the same channels of commerce and forms of advertising to target the same prospective customer base, there is some evidence of intentional copying, and the mark could be deemed suggestive. Importantly however, there is not a single instance of actual confusion over the many years the parties have been in the marketplace together. Skawa Facts ¶ 28. Even given that the other factors favor Smartling, the absence of actual confusion weighs strongly against the likelihood of confusion, which is critical to the claims asserted. Although the Court remains skeptical that Smartling can rebut this evidence of little likelihood of confusion, and there remains serious doubt as to whether Smartling can prove any damages related to its trademark infringement and unfair competition claims, the Court will deny summary judgment and allow the case to proceed to trial. "Because the likelihood of confusion analysis is a particularly fact-intensive one, resolving this issue on summary judgment is disfavored." Dorpan, S.L. v. Hotel Melia, Inc., 728 F.3d 55, 66 (1st Cir. 2013); see Bos. Athletic Ass'n v. Sullivan, 867 F.2d 22, 24 (1st Cir. 1989) (noting that "infringement and unfair competition cases often present factual issues that render summary judgment inappropriate" (quoting Kazmaier v. Wooten, 761 F.2d 46, 48–49 (1st Cir. 1985)); see also Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1210 (9th Cir. 2012) ("[D]istrict courts should grant summary judgment motions

regarding the likelihood of confusion sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record." (citation omitted)); AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 616 (7th Cir. 1993) ("[A] motion for summary judgment in trademark infringement cases must be approached with great caution."); Country Floors, Inc. v. P'ship Composed of Gepner & Ford, 930 F.2d 1056, 1063 (3d Cir. 1991) (noting that in the likelihood of confusion context "summary judgments are the exception"); cf. Pignons, 657 F.2d at 486 (1st Cir. 1981) (explaining that although not unheard of, "summary disposition is usually inappropriate in complex infringement and unfair competition cases"). Accordingly, summary judgment is denied on Counts I, III, IV, and VI.

## B. Count II: Trade Dress Infringement

Smartling asserts in Count II that Skawa committed trade dress infringement by copying aspects of Smartling's website when Skawa launched the Easyling website in late 2011. "The Lanham Act extends protection not only to words and symbols, but also to 'trade dress,' defined as 'the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer.'" Yankee Candle Co. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 37–38 (1st Cir. 2001) (quoting Chrysler Corp. v. Silva, 118 F.3d 56, 58 (1st Cir. 1997)). "The primary purpose of trade dress protection is to protect that which identifies a product's source." Id. (citing I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 35 (1st Cir. 1998)). "Courts recognize trade dress claims based both on product packaging and on 'product design/configuration.'" Id. (quoting Wal-Mart Stores v. Samara Bros., Inc., 529 U.S. 205, 213–14 (2000)). Additionally, distinctive characteristics that are "akin to product packaging" may be entitled to trade dress protection. See Wal-Mart, 529 U.S. at 215. "[T]rade dress involves the total image of a product and may include features such as size, shape,

color or color combinations, texture, graphics, or even particular sales techniques." Gurglepot, Inc. v. New Shreve, Crump & Low LLC, 153 F. Supp. 3d 441, 448 (D. Mass. 2015) (quoting Gen. Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405, 414 (6th Cir. 2006)).

Although the First Circuit has not addressed whether the appearance of a website may constitute protectable trade dress, Skawa does not contend that Smartling's website is inherently incapable of protection. Other courts have concluded that "the 'look and feel' of a web site can constitute a trade dress protected by the Lanham Act." Ingrid & Isabel, LLC v. Baby Be Mine, LLC, 70 F. Supp. 3d 1105, 1136 (N.D. Cal. 2014).[11] Accordingly, the Court will assume for the purposes of summary judgment that the look and feel of a website may receive trade dress protection.

"In order for trade dress to be protected under § 43(a), a plaintiff must prove that the dress is: (i) used in commerce; (ii) non-functional; and (iii) distinctive." Yankee Candle Co., 259 F.3d at 37−38 (quoting I.P. Lund, 163 F.3d at 36); see also Genesis Strategies, Inc. v. Pitney Bowes, Inc., 50 F. Supp. 3d 59, 63 (D. Mass. 2014), on reconsideration in part, No. 11-12270-TSH, 2014 WL 4292830 (D. Mass. Aug. 27, 2014). "Finally, to prove infringement of protected trade dress, the plaintiff must show that another's use of a similar trade dress is likely to cause

---

[11] See also Express Lien Inc. v. Nat'l Ass'n of Credit Mgmt. Inc., No. 13-cv-3323, 2013 WL 4517944, at *4 (E.D. La. Aug. 23, 2013) (denying motion to dismiss trade dress infringement claim where plaintiff "alleges that the website design, including the color, code elements, and orientation is widely recognized by consumers and has become a valuable indicator of the source and origin of the information in its website"); Card Tech Int'l LLLP v. Provenzano, No. CV 11–2434 DSF (PLAx), 2011 WL 13220408, at *11 (C.D. Cal. Nov. 7, 2011) (granting preliminary injunction prohibiting use of company's website trade dress by competitor); Conference Archives, Inc. v. Sound Images, Inc., No. 2006-cv-76, 2010 WL 1626072, at *16 (W.D. Pa. Mar. 31, 2010) (holding that "the 'look and feel' of a web site can constitute a trade dress, protected by the Lanham Act"); SG Servs. Inc. v. God's Girls Inc., No. CV 06-989 AHM, 2007 WL 2315437, at *8 (C.D. Cal. May 9, 2007) (considering colors and phrases used on website in deciding motion for summary judgment motion on trade dress claim).

confusion among consumers as to the product's source." Yankee Candle Co., 259 F.3d at 37–38

(quoting I.P. Lund, 163 F.3d at 43–44).

    1.  The Trade Dress At Issue

  As an initial matter, "the burden to clearly identify the trade dress at issue is on the

plaintiff." Yankee Candle Co, 259 F.3d at 40 n.9 (citing Landscape Forms v. Columbia Cascade

Co., 113 F.3d 373, 381 (2d Cir. 1997)). Smartling may not "dispense with an articulation of the

specific elements which comprise its distinct dress." Landscape Forms, 113 F.3d at 381. As the

Second Circuit explained:

> Without such a precise expression of the character and scope of the claimed trade
> dress, litigation will be difficult, as courts will be unable to evaluate how unique
> and unexpected the design elements are in the relevant market. Courts will also be
> unable to shape narrowly-tailored relief if they do not know what distinctive
> combination of ingredients deserves protection. Moreover, a plaintiff's inability to
> explain to a court exactly which aspects of its product design(s) merit protection
> may indicate that its claim is pitched at an improper level of generality, i.e., the
> claimant seeks protection for an unprotectable style, theme or idea.

Landscape Forms, 113 F.3d at 381; see Cent. Tools, Inc. v. Prod. Eng'g Corp., 936 F. Supp. 58,

65 (D.R.I. 1996) ("[T]he discrete elements . . . should be separated out and identified in a list.

Only then can the court and the parties coherently define exactly what the trade dress consists of

and determine whether that trade dress is valid and if what the accused is doing is an

infringement." (quoting 1 McCarthy on Trademarks § 8.01[1][c])); Salt Optics, Inc. v. Jand, Inc.,

No. SACV 10-828 DOC (RNBX), 2011 WL 13055856, at *2 (C.D. Cal. Mar. 4, 2011) ("[A]

mere cataloguing of a website's features provides inadequate notice of a plaintiff's claimed 'look

and feel' trade dress.").

  Here, Smartling has adequately identified a set of elements for which it claims trade dress

protection. Smartling's trade dress infringement claim relies on the "design elements discussed

in paragraphs 22 to 26" of the Amended Complaint, which reference a depiction of the late 2011

version of Smartling's website and provide a detailed description of infringed elements from that version of the website. Am. Comp. ¶ 41. Those paragraphs claim that the following trade dress elements were infringed:

> a. In 2011, Smartling's website contained an orange and light blue color schematic. . . . The trim of the website and the "buttons" were in orange and the website featured a light blue strip in the center of the website . . . .

> b. In the left-hand side of the light blue strip on Smartling's website, Smartling announced to prospective customers, "Translate your website." . . . .

> c. On the upper right-hand corner of Smartling's June 2011 website, the company provided links labeled "HOW IT WORKS" and "PRICING". . . .

Am. Compl. ¶ 24. In addition, Smartling's website included "a promotional video that customers could watch directly on the website by clicking a 'play' button," and it used a white, lower-case letter, sans-serif font to display the Smartling mark, along with a speech bubble adjacent to the word "Smartling." Am. Compl. ¶¶ 23, 25−26.

## 2. Used in Commerce

Skawa contends that Smartling's trade dress has not been used in commerce since 2011 and has therefore been abandoned. A mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127. Trademarks are abandoned when their "use has been discontinued with intent not to resume such use." Id. Three consecutive years of nonuse creates a presumption of abandonment for purposes of both trade dress and trademark infringement claims. See Gen. Healthcare Ltd. v. Qashat, 364 F.3d 332, 336 (1st Cir. 2004) ("A trademark owner who fails to use a mark for three consecutive years may be deemed to have abandoned the mark, which would then fall into the public domain."); PBI Performance Prod., Inc. v. Norfab Corp., 514 F. Supp. 2d 725, 731 (E.D. Pa. 2007) (finding trade dress abandoned based on three years of non-use); but see Peter Luger Inc. v. Silver Star Meats Inc., No. CIV.A.01-1557, 2002 WL 1870066, at *15 (W.D. Pa. May 17,

2002) (holding that an interest in trade dress may persist despite abandonment of a brand name where a company seeks to transition residual good will).

Smarting argues that the infringed trade dress was in use at the time of the alleged infringement, and even if the copied version of its website was not still in use, there remains a "great deal of continuity between the websites that Smartling used before and after" the launch of the updated website. [ECF No. 89 at 22]. The Smartling word mark was generally shown in the same font and logo, and the orange and blue color scheme continued to be prominently featured as of 2011. Considering the disputes of fact over when Smartling updated its website and the extent of the continuity between the copied version of the website and subsequent versions, the issue of abandonment turns on triable questions of fact. See Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc., 458 F.3d 931, 940 (9th Cir. 2006) (a mark is not abandoned until its holder "actually discontinue[s] use of the trademark with intent not to resume such use"); see also J. Thomas McCarthy, 3 McCarthy on Trademarks and Unfair Competition § 17:12 (5th Ed. 2018) ("[E]vidence of the elements of abandonment must be clear and convincing.").

### 3. Non-Functional

The non-functional requirement is intended "to protect advances in functional design from being monopolized." LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, 76 (2d Cir. 1985) overruled on other grounds by Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763 (1992); see Qualitex Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 165 (1995) ("A product feature is functional . . . if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage."). Words used ubiquitously as links on websites that sell services, such as "how it works" and "pricing," or standard advertising features, such as use of a video, may be functional even though they are not part of the design of the underlying product,

but the placement, color, font, and size of such features come in nearly infinite variations. The Court concludes that at least portions of the asserted trade dress were non-functional and operated only to give Smartling's website its look and feel. See Conference Archives, 2010 WL 1626072, at *17 ("As long as there are alternate ways to design a web site, beyond the arrangement protected by the trade dress, the site's interface should not be considered functional.").

4.    Distinctive

The Supreme Court has concluded that *a product's* design-based trade dress is "distinctive, and therefore protectable, only upon a showing of secondary meaning," but the Court has differentiated trade dress that appears on product packaging or, for example, in the design of a restaurant, which may be inherently distinctive. Wal-Mart, 529 U.S. 205, 215–16; see also Two Pesos, 505 U.S. at 776 (holding, in the context of alleged infringement of a restaurant's Mexican trade dress including layout, color scheme, and decorations, that "proof of secondary meaning is not required to prevail on a claim . . . where the trade dress at issue is inherently distinctive"). Smartling's website is not part of the product it sells, and it serves primarily to identify Smartling and provide information about its services. The website is therefore entitled to trade dress protection if it is inherently distinctive or has acquired secondary meaning.

Smartling claims that the "Smartling" mark was inherently distinctive. The Smartling mark may also have worked in combination with Smartling's website layout, color-scheme, chosen words for links, and its video to give the website an inherently distinctive look and feel. Although for the reasons discussed herein, it will be difficult for Smartling to show that consumers were likely to be confused as to the product's source, a reasonable jury could potentially reach that conclusion. See supra Section III.A.6; infra Section III.B.5; compare Two Pesos, 505 U.S. at 776 (inherently distinctive trade dress found by jury based on many factors

25

creating restaurant's eating atmosphere), with SG Servs., 2007 WL 2315437, at *10 (use of color pink and certain phrases on website did not constitute trade dress).

Smartling also argues that its website's look and feel had a secondary meaning. A trade dress "has developed 'secondary meaning' when 'in the minds of the public, the primary significance of [it] is to identify the source of the product rather than the product itself.'" Bern Unlimited, Inc. v. Burton Corp., 95 F. Supp. 3d 184, 205–06 (D. Mass. 2015) (quoting Wal-Mart, 529 U.S. at 211). Smartling's claimed secondary meaning must be judged "at the time of the first alleged infringement" in 2011. Id. (citing Yankee Candle, 259 F.3d at 40). "The central inquiry for secondary meaning is whether, 'in the minds of the relevant consumers, the primary significance of the [Plaintiff's] design is to identify the source of the product,' rather than the product itself." Carroll Shelby Licensing, Inc. v. Superperformance Int'l., Inc, 251 F. Supp. 2d 983, 986 (D. Mass. 2002). A mark has secondary meaning when "a significant quantity of the consuming public" uses the mark to identify the source of the product or service. President & Trustees of Colby College v. Colby College–N.H., 508 F.2d 804, 807 (1st Cir. 1975); see Genesis Strategies, 50 F. Supp. 3d at 65 ("A mark has secondary meaning when enough of the consuming public uses the mark to identify the source of the product or service."). "[I]t is the party seeking protection of a mark who bears the burden of proving that secondary meaning has attached." Boston Beer Co. P'ship v. Slesar Bros. Brewing Co., 9 F.3d 175, 181 (1st Cir. 1993) (citations omitted). "It is well-established that '[p]roof of secondary meaning entails vigorous evidentiary requirements.'" Bern Unlimited, 95 F. Supp. 3d at 206 (quoting Yankee Candle, 259 F.3d at 43). Although survey evidence is not required, consumer surveys and testimony by individual consumers are the "only direct evidence probative of secondary meaning." Yankee Candle, 259 F.3d at 43.

There is little direct evidence of secondary meaning here. Smartling has not introduced survey evidence that consumers associated its dress elements with Smartling. The only potential evidence from consumers that Smartling has identified are one email sent by an individual stating that "imitation is the sincerest form of flattery" with regards to a webinar titled "Your New Website Translation Solution –XTM with Easyling," and one email from Lionbridge stating that Easyling is "[r]ipping off your name and website look and feel." [ECF Nos. 89-8, 89-9]. Smartling has not identified the individual who sent the "imitation is the sincerest form of flattery" email as a consumer of its services, and Lionbridge's view is only minimally probative given that Lionbridge was Smartling's primary client and sold Smartling's product to other consumers. See Bern Unlimited, 95 F. Supp. 3d at 206 ("[E]vidence that a retailer views the trade dress as distinctive is not probative of secondary meaning." (citing Yankee Candle, 259 F.3d at 43 n.14)).

Smartling may also, however, present indirect evidence of secondary meaning. Factors to be considered as indirect evidence of secondary meaning are:

> 1) the length and manner of the use of the trade dress; 2) the nature and extent of advertising and promotion; 3) the efforts to promote a conscious connection between the public, the trade dress, and the source; 4) the products' established place in the market (possibly through continuous use in the market); and 5) proof of intentional copying.

Genesis Strategies, 50 F. Supp. 3d at 67 (D. Mass. 2014) (citing Yankee Candle, 259 F.3d at 43–44). The first factor does not strongly favor either party. Smartling used its mark on the website continuously with slight modifications and maintained its non-functional color scheme. See [ECF No. 78-5]. Smartling acknowledges, however, that it launched a new version of its website in late 2011 that modified several aspects of the alleged trade dress, and it frequently changed the appearance and features before and after the alleged infringement. [ECF No. 89 at 22]. Smartling has offered similarly limited indirect evidence of secondary meaning relevant to the second,

third, and fourth factors. This includes evidence of advertising and promotion, a connection between the public, the trade dress, and the source, and its established place in the market through an affidavit from its co-founder and CEO John Welde, who attests that "Smartling has invested a great deal of time and expense in building a brand that is well-known and respected in the industry" and "spent considerable time, money, and effort to develop trade dress that was distinctive, and representative of the brand." [ECF No. 89-1]. Smartling also relies on the "[r]ipping off your name and website look and feel" and "imitation is the sincerest form of flattery" emails discussed supra, which while not persuasive direct evidence of secondary meaning, provide some support for Smartling's contention that the allegedly infringed trade dress distinguished Smartling from its competitors.

Smartling relies most heavily on the fifth factor—proof of intentional copying—to argue that it can prove secondary meaning through indirect evidence. [ECF No. 89 at 20–21]. Smartling emphasizes the fact that Skawa copied its terms and conditions, but provides no case law in support of its contention that usage of the same contractual language constitutes material proof of copying trade dress. There is, however, little doubt that Skawa copied other aspects of Smartling's alleged trade dress. Although it may be that Skawa copied Smartling's website out of mere laziness, it would not be unreasonable for a jury to conclude that Skawa copied features of Smarling's website because they viewed is as distinctive and attractive to consumers. Considering the evidence, Smartling has brought forth sufficient evidence to allow a jury to conclude that Smartling's website was distinctive, either inherently or through the use of the Smartling mark in combination with other design elements, or due to secondary meaning that consumers attached to the trade dress elements that Skawa infringed.

5.      <u>Likely to Cause Confusion Among Consumers as to the Product's Source</u>

A reasonable jury could also find that consumers were likely to be confused as to the source of the product based on the Easyling site's similarity to the trade dress identified by Smartling. The parties dispute whether there was temporal overlap in their respective use of several of the trade dress elements at issue. Although Smartling updated its website in late 2011 such that there was no longer a light blue strip in the center of the website, orange buttons and trim, text in the center of the page saying "translate your website," links for "HOW IT WORKS" and "PRICING" in the upper right-hand corner, or the video described in the Amended Complaint, Easyling's late 2011 website mimicked those and other features of Smartling's website. <u>Compare</u> [ECF No. 78-5 at 5], <u>with</u> [ECF No. 25-1 at 11]. Additionally, some of the mimicked features, including the Smartling mark and the color scheme continued to be used by Smartling long after it replaced most of the features that Smartling copied. <u>See</u> [ECF No. 78-5]. As discussed above, <u>supra</u> part III.A.1, the Easyling mark viewed in isolation could have been confused with the Smartling mark, and a jury could reasonably conclude that the other features that Skawa copied made that confusion more likely. Skawa's motion to dismiss Smartling's trade dress claim will therefore be denied.

**C.      Count V: Chapter 93A**

Skawa next seeks summary judgement on Smartling's Chapter 93A claim on the grounds that the alleged unfair or deceptive acts or practices did not occur within the Commonwealth. To bring a Chapter 93A claim, the "unfair method of competition or the unfair or deceptive act or practice" must have "occurred primarily and substantially within the commonwealth." Mass. Gen. Laws ch. 93A, § 11. The statute further specifies that "the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth." <u>Id.</u> The statute "suggests an approach in which a judge should, after

making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." Kuwaiti Danish Comput. Co. v. Dig. Equip. Corp., 781 N.E.2d 787, 799 (Mass. 2003). "In making this determination, a court focuses solely on the actionable conduct said to give rise to the violation; other conduct, no matter where it takes place, may not be considered on the question." Spring Inv'r Servs., Inc. v. Carrington Capital Mgmt., LLC, No. 10-cv-10166-FDS, 2013 WL 1703890, at *12 (D. Mass. Apr. 18, 2013). The Massachusetts Supreme Judicial Court has cautioned that evaluating whether the conduct at issue occurred primarily and substantially within the Commonwealth "is not a determination that can be reduced to any precise formula," and the court has explicitly "declined to create a list of factors to be used in determining whether conduct alleged to be actionable under [Chapter 93A] occurred primarily and substantially within the Commonwealth." Kuwaiti Danish, 781 N.E.2d at 798. Rather, "[s]ignificant factors that can be identified for one case may be nonexistent in another," and the "determination necessarily will be fact intensive and unique to each case." Id. Further, "it may, or may not, be appropriate to decide cases involving wrongful conduct in multiple jurisdictions based on which jurisdiction was the source of the most instances of misconduct," since "a single instance of misconduct in one jurisdiction" may have the greatest significance, or, on the other hand, a large "number of instances of misconduct in one jurisdiction may produce the heft needed to resolve the question." Id. at 798–99. "[I]f the significant contacts of the competing jurisdictions are approximately in the balance, the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts." Uncle Henry's Inc. v. Plaut Consulting Co., 399 F.3d 33, 45 (1st Cir. 2005).

In Yankee Candle Co. v. Bridgewater Candle Co., the district court focused on three factors to determine whether deceptive practices related to trademark and trade dress infringement occurred primarily and substantially in Massachusetts: "(i) where the defendant committed the [alleged] deception; (ii) where plaintiff was deceived and acted upon the deception; and (iii) the situs of plaintiff's losses due to the deception." 107 F. Supp. 2d 82, 88 (D. Mass. 2000) (citation omitted), aff'd, 259 F.3d 25 (1st Cir. 2001).

As to the first factor, it is undisputed that Skawa is based in Hungary and operates Easyling out of Hungary. Smartling Response ¶ 49; Skawa Response ¶ 2. Smartling primarily relies on the fact that its largest client, Lionbridge, is based in Massachusetts to establish that the misconduct primarily and substantially occurred in Massachusetts. [ECF No. 89 at 26]. At most, the evidence shows that Skawa traveled to Massachusetts on one occasion in 2014 to meet with Lionbridge. [ECF No. 78-17]. To the extent that Skawa otherwise communicated with Lionbridge from outside of Massachusetts, the record is clear that Lionbridge was aware that Smartling and Easyling were separate, unrelated companies. [ECF No. 78-2 at 139]. Given that the only Massachusetts-based client with whom Skawa communicated was not confused about Smartling and Easyling's relationship, this factor weighs in favor of Skawa.

The second factor, which has been characterized as "the locus of the recipient of the deception at the time of the reliance," also supports Skawa. Yankee Candle Co., 107 F. Supp. 2d at 88 (citation omitted). Because Smartling alleges that its customers, rather than Smartling itself, were the recipients of the alleged deception, the Court considers where the clients or customers were deceived. As in Yankee Candle Co., "[t]he vast majority of the recipients of the deception charged in the complaint, *i.e.,* the [plaintiff's] customers, were undeniably outside Massachusetts when they were targeted for [defendant's] alleged misconduct. Thus, the fairest interpretation of

the second . . . factor weighs in favor of [the defendant]." Id.; see CDS, Inc. v. Karndean Int'l, LLC., No. 15-148M, 2017 WL 1379603, at *8 (D. R.I. Mar. 17, 2017) (finding evidence that defendants' sales representatives conducted joint sales calls with plaintiff to customers in Massachusetts and attended trade shows in Massachusetts to be insufficient evidence of primary and substantial nexus to Massachusetts); Alex & Ani, LLC v. Elite Level Consulting, LLC, 31 F. Supp. 3d 365, 372 (D. R.I. 2014) (involvement of distribution company in Massachusetts that acted "as nothing more than an uninvolved middleman" and its location in Massachusetts were not "meaningful in any apparent way," and were insufficient to establish center of gravity in Massachusetts); see also Skyhook Wireless, Inc. v. Google Inc., No. 2010–3652–BLS1, 2012 WL 5309755, *17 (Mass. Super. Ct. Sept. 28, 2012) ("As to the loss of sales to consumers here, the undisputed facts establish that mobile devices are marketed worldwide. Thus, on Skyhook's theory, the center of gravity of the transactions was everywhere in the world.").

Here, there is no evidence that Lionbridge, an experienced, professional purchaser of translation services, with substantial relationships with both Smartling and Skawa, ever confused or is likely to confuse the two companies. In fact, it was Lionbridge that pointed out to Smartling in a 2012 email that Skawa was "[r]ipping off [Smartling's] name and website look and feel." [ECF No. 89-8]. Skawa has shown that all of the other allegedly harmed clients of Smartling were located outside of Massachusetts and across the country with no counter allegations from Smartling. Smartling Response ¶ 50; see Fishman Transducers, Inc. v. Paul, 684 F.3d 187, 197 (1st Cir. 2012) ("Where wrongdoing is not focused on Massachusetts but has relevant and substantial impact across the country, the 'primarily' requirement of [Chapter 93A] cannot be satisfied"); see Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd., No. 02-cv-12102-RWZ, 2006 WL 1766434, at *12 (D. Mass. June 28, 2006) (location of one of forty-seven

customers in Massachusetts was insufficient to warrant Chapter 93A jurisdiction where plaintiff had "no proof that [defendant] engaged in [planning or communications]" in Massachusetts). To the extent that the actions of Lionbridge might somehow contribute to the confusion of other Smartling clients, there is no evidence suggesting that Skawa had any responsibility or involvement with Lionbridge's conduct with regard to Smartling's clients. Lionbridge is not a party to this action, and the Amended Complaint contains no allegations regarding Lionbridge's participation in moving clients from Smartling to Easyling.

Finally, the third factor, where the loss occurred, weighs slightly, if at all, in favor of Skawa. "[W]hatever financial loss occurred was undoubtedly felt most acutely at [Smartling's] headquarters" in New York, thereby supporting Skawa. Yankee Candle Co., 107 F. Supp. 2d at 88; Smartling Response ¶ 48. Smartling is not incorporated in Massachusetts, and although it had an office and some employees based in Massachusetts beginning in 2013 or 2014, Smartling had no such presence in Massachusetts at the time Skawa allegedly misappropriated Smartling's trademark in late 2011. [ECF No. 89-1 ¶ 10]. Even if this factor favored Smartling, , "[w]hen the place of injury . . . is the only factor weighing in favor of a claimant, the admonition of Massachusetts courts that liability under chapter 93A is not to be imposed lightly is particularly relevant." Yankee Candle Co., 107 F. Supp. 2d at 89 (quoting Roche v. Royal Bank of Can. 109 F.3d 820, 831 (1st Cir. 1997)); see Spring Inv'r Servs., 2013 WL 1703890, at *13 ("As many courts have previously held, a place of injury within Massachusetts is not a sufficient basis for finding that conduct occurred 'primarily and substantially' within the Commonwealth.").

In sum, Skawa has met its burden in showing that the alleged misconduct did not occur primarily and substantially in the Commonwealth of Massachusetts. Neither of the parties are Massachusetts companies or have a principal place of business in Massachusetts. The only

Smartling client in Massachusetts was Lionbridge, which is the one client that the parties agree was not confused about Smartling and Skawa's brands and products.[12] Accordingly, summary judgment is granted on Count V in favor of Skawa.

### D. Laches

Skawa asserts the affirmative defense of laches to bar Smartling's lawsuit, because Smartling allegedly became aware of the Easyling mark in 2011, but took no legal action until 2014. [ECF No. 78 at 38–39]. Skawa claims that Smartling's inaction caused prejudice because Skawa relied on it when "entering and expanding commerce in the United States, hiring employees, and otherwise expanding the Easyling business project." Id. "Defendants have the burden of proving laches." Copy Cop, 908 F. Supp. at 47 (quoting Lotus Dev. Corp. v. Paperback Software Int'l, 740 F. Supp. 37, 82 (D. Mass. 1990)). "To prevail, 'defendants must prove by a preponderance of the evidence (1) that plaintiff inexcusably and unreasonably delayed in bringing this action; and (2) that the delay has prejudiced defendants.'" Id. (quoting Lotus Dev. Corp., 740 F. Supp. at 82). "[L]aches applies only where the plaintiff knew or should have known of the infringing conduct." Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Crédito Oriental, 698 F.3d 9, 21 (1st Cir. 2012) (citing Valmor Prods. Co. v. Standard Prods. Corp., 464 F.2d 200, 204 (1st Cir. 1972)); see also What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi, Tex., 357 F.3d 441, 449 (4th Cir. 2004) ( "Instead of focusing on when the trademark owner first knew that another party was using its mark, the court should be trying to determine the time at which the use became infringing and the time at which the owner should

---

[12] Although the Court focuses on the three factors articulated in Yankee Candle, it remains mindful of the state court view that this determination should not be formulaic and notes that it finds no other factors that would warrant a finding that the alleged conduct took place primarily or substantially in Massachusetts.

have known it . . . ."); <u>ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical</u>

<u>Therapy P.C.</u>, 314 F.3d 62, 70 (2d Cir. 2002) ("[A] plaintiff should not be obligated to sue until

its right to protection has ripened such that plaintiff knew or should have known . . . that plaintiff

had a provable infringement claim against defendant.").

Here, Skawa's own theory of the case is that between November 2011 and approximately

July 2013, Smartling did not view Skawa as a serious competitor. [ECF No. 78 at 5]. That

Smartling waited until there was some significant impact on its business before filing its lawsuit

may be excusable delay. <u>See</u> <u>Copy Cop</u>, 908 F. Supp. at 47 ("A reasonable businessman should

be afforded some latitude to assess both the impact of another's use of an allegedly infringing

trademark as well as the wisdom of pursuing litigation on the issue." (quoting <u>Tandy Corp. v.</u>

<u>Malone & Hyde, Inc.</u>, 769 F.2d 362, 366 (6th Cir. 1985))); <u>Lotus Dev. Corp.</u>, 740 F. Supp. at 82

(delay of one year and two months to bring trademark infringement lawsuit was not

unreasonable, given that "[p]rudent business judgment, Rule 11 and basic common sense

required [plaintiff] first to ascertain that the threat to its intellectual property interest was serious

and that its legal position was sound before filing suit"); <u>see also</u> <u>Orietal Fin. Grp., Inc.</u>, 698 F.3d

at 21–23 (plaintiff can defeat a laches defense in a trademark case by showing that, *inter alia*,

"the earlier infringement . . . even if actionable, was so small in scope that a reasonable

trademark owner could conclude that an infringement suit was not worth the costs of bringing

suit" or that after beginning the use of its mark, the defendant "*redirected its business* so that it

more squarely competed with plaintiff" thus warranting late legal action). Skawa has failed to

establish that there are no triable issues of fact as to whether Smartling excusably delayed filing

this lawsuit to assess the impact of the alleged infringement on its business and intellectual

property interests. Summary judgment is therefore denied on Skawa's laches defense.

## IV.    SMARTLING'S MOTION FOR SUMMARY JUDGEMENT

Smartling also moves for summary judgment on Skawa's Counterclaim which asserts that Smartling violated Chapter 93A. Skawa alleges in its Counterclaim that this lawsuit is objectively meritless and that, upon information and belief, Smartling has "repeatedly claimed to potential clients of . . . Skawa and others at exhibitions and elsewhere that . . . Skawa would be driven into bankruptcy by this litigation." Counterclaim ¶ 27. Skawa further claims that those representations "inherently and falsely suggest" that Skawa was in a precarious financial position and are indicative of Smartling's ulterior motives in filing this lawsuit. Id. ¶ 28.

Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). "It is well established that 'a practice or act [is] unfair under G.L. c. 93A, § 2, if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.'" Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d 244, 259 (Mass. 2008) (quoting Morrison v. Toys "R" Us, Inc., 806 N.E.2d 388, 392 (Mass. 2004). "To be actionable, the challenged misconduct must rise to the level of an 'extreme or egregious' business wrong, 'commercial extortion,' or similar level of 'rascality' that raises 'an eyebrow of someone inured to the rough and tumble of the world of commerce.'" Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., 802 F.3d 39, 54 (1st Cir. 2015) (quoting Baker v. Goldman Sachs & Co., 771 F.3d 37, 49–51 (1st Cir. 2014) and Zabin v. Picciotto, 896 N.E.2d 937, 963 (Mass. App. Ct. 2008)). "'Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a

question of fact . . . the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law.'" Zabin, 896 N.E.2d at 964 (citation omitted).

Here, Skawa primarily proceeds on an "abuse of process" theory of Chapter 93A liability, but also alleges that Smartling made statements to damage Skawa's potential business relationships. "The elements of an abuse of process claim are 'that "process" was used, for an ulterior or illegitimate purpose, resulting in damage.'" Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 534 (Mass. 2011) (quoting Millennium Equity Holdings, LLC v. Mahlowitz, 925 N.E.2d 513, 522 (Mass. 2010)). The requirement of an "ulterior purpose," however, "is not satisfied merely by a showing that a person commenced litigation knowing it was groundless." Id. Rather, the ulterior purpose "must be to gain some collateral advantage," id. at 535, with "collateral" meaning "collateral to the legitimate purposes of the proceeding." Id. at n.36; see also Broadway Mgmt. Servs. Ltd. v. Cullinet Software, Inc., 652 F. Supp. 1501, 1503 (D. Mass. 1987) (noting that "ulterior motive" is "more than the intent to harass; there must be intention to use process for coercion or harassment to obtain something not properly part of the suit"); Beecy v. Pucciarelli, 441 N.E.2d 1035, 1040 (Mass. 1982) (holding that "mere commencement of litigation to enforce a claim which the person commencing the litigation knows or reasonably should have known to be groundless" does not constitute abuse of process "without proof of any ulterior purpose"). "In particular, merely intending to 'cause a party to expend substantial time and money to defend against the claim in a suit' does not prove abuse of process." Empire Today, LLC v. Nat'l Floors Direct, Inc., 788 F. Supp. 2d 7, 23–24 (D. Mass. 2011) (quoting N. Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting LLC, 491 F. Supp. 2d 111, 130 (D. Mass. 2007)); see Broadway Mgmt. Servs. Ltd. v. Cullinet Software, Inc., 652 F. Supp. 1501, 1504 (D. Mass. 1987) ("[Plaintiff] has not maliciously abused process by seeking damages from

[defendant] for an allegedly wrongful termination of a contract even if [plaintiff] concurrently intended [defendant] to be burdened with the ordinary costs of defending such a lawsuit."). For a viable claim, "there must be [an] intention to use process for coercion or harassment to obtain something not properly part of the suit." Empire Today, 788 F. Supp. 2d at 24 (quoting N. Shore, 491 F. Supp. 2d at 130).

With regard to Skawa's allegation that Smartling used this lawsuit as a tool to interfere with Skawa's prospective business relationships, at the motion to dismiss stage, this Court held that "[a]lthough the facts alleged in the Counterclaim are not particularly robust, they [were] sufficient, for purposes of a motion to dismiss, to nudge Skawa's Chapter 93 claim 'across the line from conceivable to plausible.'" Smartling, Inc. v. Easyling LLC, No. 14-cv-13106-ADB, 2016 WL 913142, at *3 (D. Mass. Mar. 9, 2016) (citation omitted). Now, at summary judgment, Skawa contends that Smartling's lawsuit is baseless because it was brought "in spite of the evidence." Empire Today, 788 F. Supp. 2d at 26 n.146 ("[T]he First Circuit agreed that bringing a lawsuit in spite of the evidence may indeed constitute an unfair and deceptive practice under 93A."); see Refuse & Envtl Sys., Inc. v. Indus. Servs. of Am., Inc., 932 F.2d 37, 43 (1st Cir. 1993) (bringing a lawsuit "in spite of the evidence" is a willful violation of Chapter 93A); George Hyman Constr. Co. v. Gateman, 16 F. Supp. 2d 129, 162 (D. Mass. 1998) ("A party may bring a claim under [Chapter] 93A against another party which willfully filed a baseless lawsuit."). The Court has now concluded that Smartling's lawsuit may proceed to trial on trademark infringement claims. As such, a 93A claim based on abuse of process cannot stand. Quaker State Oil Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513–14 (1st Cir. 1989).[13]

---

[13] Skawa otherwise relies on a handful of emails that allegedly show that Smartling intended to use this lawsuit to damage Skawa's business prospects. Smartling employees wrote in emails between July 2013 and March 2014 "I think we should be careful. They are building a lot of

Skawa further suggests that Smartling made statements outside of litigation to interfere with Skawa's prospective business relationships. Although the Counterclaim alleges that Smartling "repeatedly claimed to potential clients of . . . Skawa and others at exhibitions and elsewhere that . . . Skawa would be driven into bankruptcy by this litigation," [ECF No. 33 ¶ 27], the evidence in the record amounts to a single affidavit describing Smartling's statements at one industry conference. [ECF No. 86-1]. The affiant, Mr. Jose Palomares, attests that he attended the American Translator Association's conference from November 5 through November 8, 2014, where he "spoke directly with sales representatives of Smartling," and "heard those representatives speaking with conference attendees that were potential customers of Smartling and Easyling." Id. ¶¶ 8–9. Moreover, Mr. Palomares "observed the Smartling representatives telling multiple attendees that Easyling might not be the best choice because they were having financial difficulties, including due to an ongoing lawsuit with Smartling, and that they might go out of business in the short term." Id. ¶ 10.

Skawa presents no additional information regarding the significance of the American Translator Association's annual conference with regard to Skawa's business relationships. The affidavit does not identify any of the relevant conference attendees, their names or affiliated companies, or their role at their respective companies, nor does it describe how Mr. Palomares

---

stuff. I don't like being surprised by folks like this," "[t]hey are catching up with us," and that Skawa is "beating us up on pricing." Smartling's CEO in particular wrote in one email, sent over a year before the lawsuit was filed, "I was ok with [Easyling] until they started pitching my friends. Now they have to die." [ECF No. 78]. These emails suggest that Smartling was wary of Skawa's progress as a competitor in the field, but there is no evidence from which the Court can infer that Smartling ever considered using legal process to oppress Skawa as a competitive threat. See Empire Today, 788 F. Supp. 2d 7, 24–25 (two emails revealing a discussion by Plaintiff's top management of using a lawsuit as means of hurting defendant's business was insufficient to establish liability under Chapter 93A); id. at 24 (counterclaim plaintiff "has shown no casual connection between the March 2008 e-mail sent by [plaintiff] and [plaintiff's] decision to bring suit about eight months later").

knew that these attendees were "potential" customers of both parties. There is no evidence showing the impact of these statements on the conference attendees or suggesting that Mr. Palomares himself was in any way affected by them. There is likewise no evidence concerning the damages that Skawa purportedly incurred as a result of these statements. Even accepting the statements in the affidavit as true, they show at most that during one out-of-state industry conference that took place after the filing of this lawsuit, one attendee overheard unidentified Smartling representatives stating to other unidentified attendees that Skawa "might" not be the "best" choice "at the time" because of the financial difficulties associated with Smartling's lawsuit, and "might" go out of business soon. Id. ¶ 10. Such equivocal and speculative statements, made solely to a limited number of conference attendees, are not sufficiently immoral or oppressive conduct to constitute the sort of "extreme or egregious" business practice necessary to sustain a 93A claim. Although Skawa's allegations were sufficient to survive the pleadings stage, the evidence is plainly insufficient to create a genuine issue of material fact. Summary judgment is therefore granted in Smartling's favor on the Counterclaim in its entirety.

## V.  CONCLUSION

For the reasons stated, (1) Easyling LLC is dismissed as a party in this case; (2) Skawa's motion for summary judgment [ECF No. 77] is granted on Count V (Chapter 93A) of the Amended Complaint and denied on the remaining counts; and (3) Smartling's motion for summary judgment [ECF No. 74] is granted on Skawa's 93A Counterclaim.

**SO ORDERED.**

January 31, 2019                                        /s/ Allison D. Burroughs
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE